UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

GREGORY T. GUNDLACH, PH.D.,

        Plaintiff,

vs.                            Case No.  3:03-cv-1003-J-32MCR

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE,
INC.,

        Defendant.
_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

      This diversity case came before the Court for a bench trial on July 7 and 8, 2005.

Following the trial, the Court reviewed both the parties' proposed findings of fact and

conclusions of law and their post-trial briefs.  The Court is now prepared to decide the

case.

## I.  Background

      Plaintiff, Gregory Gundlach, seeks compensation for services rendered in

connection with his retention by Defendant, the National Association for the

Advancement of Colored People ("NAACP"), as an expert witness in litigation filed by

the NAACP in the United States Court for the Eastern District of New York (the

"Acusport litigation").  Plaintiff's claim is based upon two theories, breach of contract

and account stated.  Plaintiff filed a Motion for Partial Summary Judgment on the

account stated claim (Doc. 18).  The Court denied that motion finding there to be issues

of fact regarding the reasonableness of any delay by Defendant in objecting to Plaintiff's invoices.  (Doc. 29).

Before trial, Defendant, notwithstanding its prior objections, paid Plaintiff's fees reflected in Plaintiff's first and third invoices as well as a portion of the expenses included on the first invoice and all of the expenses included on the second and third invoices.  Additionally, before trial, Plaintiff abandoned his claim for any further expenses.  Thus, the only remaining matter for consideration is whether Plaintiff is due the fees reflected in the second invoice dated April 23, 2003 under either a theory of breach of contract or account stated.

## II.  Findings of Fact

1.     In October 2002, the NAACP retained Plaintiff to serve as an expert in the Acusport litigation.  The Acusport litigation was brought by the NAACP against eighty-nine hand gun manufacturers and distributors and sought injunctive relief on behalf of the NAACP and its individual and potential members in the State of New York.

2.     Elisa Barnes, Esq. ("Barnes"), of the Law Office of Elisa Barnes, LLC, served as lead NAACP counsel in the case.

3.     The NAACP's claim against the defendant handgun manufacturers and distributors in the Acusport litigation was based on a theory of public nuisance under New York law.  The NAACP asserted that the defendants had created a public nuisance causing great harm to the public through their negligent marketing and distribution of handguns.

4.      In January 2001, Ms. Barnes, on behalf of the NAACP, began talking to Plaintiff about serving as an expert witness on marketing in the Acusport litigation.  Plaintiff holds a Ph.D. in marketing as well as a J.D. and is an expert in the marketing and distribution of goods.

5.      In October 2002, Barnes retained Plaintiff under an oral contract to serve as an expert in the Acusport litigation.  The contract was accepted by Plaintiff in the state of Indiana.  It was agreed that Plaintiff would be paid an hourly rate of $325.00 for his services plus his expenses incurred, which would include the cost of obtaining the assistance of various graduate students in performing some of the research and analysis.[1]  There was no cap or limit placed on the amount of time Plaintiff was to spend on the case or on the total amount of his bills.  There were also no contingencies placed on his fees.

6.      The parties generally agree that as an expert, Plaintiff was expected to prepare an expert report, which was due December 20, 2002; prepare for and testify at a deposition, which occurred February 11, 2003; and prepare for and testify at trial. Plaintiff's trial testimony lasted three days, April 8 through April 11, 2003.

7.      Plaintiff testified that after his deposition in February, he engaged in numerous tasks to prepare for trial.  Specifically, Plaintiff testified he continued to work on and refine his qualitative/descriptive analysis; continued to review materials provided by Ms.

---

[1] This agreement is only reflected in an email dated October 10, 2002 from Plaintiff to Barnes indicating his fee is "$325/hour plus expenses including assistants ($15-25/hour)." (Pl. Ex. 8).  There was no more formal or detailed written agreement concerning this undertaking.

Barnes and others involved with the case; reviewed and critiqued the defendants'

expert's report; addressed the use of the Boston and California discovery materials;

coded/quantified data; reviewed/analyzed reports of other experts; conducted field work

regarding the gun industry; prepared trial documents; worked on his web site; worked

on the issues of societal marketing/countermarketing and demarketing; prepared trial

questions/testimony; prepared a PowerPoint presentation; conducted numerous

communications with attorneys working on the case; communicated with, trained and

managed six to seven research assistants; interfaced with Lucy Allen, another expert

working for the NAACP; conducted an antitrust analysis; and prepared to discuss the

secondary/primary market issue.  (See Pl. Ex. 28).

8.     During the course of the Acusport litigation, Plaintiff prepared and submitted

three separate and itemized invoices for his services and expenses.  These statements

were dated January 8, 2003 (Pl. Ex. 20); April 23, 2003 (Pl. Ex. 21); and July 1, 2003

(Pl. Ex. 22).  The January 8 invoice, which covered the period November and December

2002, was $93,137.70.  The April 23, 2003 invoice, which covered the three month

period of January - March 2003, was $223,304.57.  The July 1, 2003 invoice, which

covered the month of April 2003, was $42,634.25.  Altogether, the invoices totaled

$359,076.52.

9.     Although Plaintiff forwarded his quarterly invoices to Barnes as dated, she

testified that she did not review the invoices when received.  Barnes explained that the

circumstances, i.e., serving as lead counsel in the six-week Acusport trial, did not allow

her a meaningful opportunity to do so.  It was not until post-trial, shortly before July 7,

2003, that  Barnes was able to address administrative matters associated with the

Acusport litigation, including reviewing Plaintiff's invoices.  Barnes wrote to Plaintiff on

July 7, 2003 (Pl. Ex. 94), the first communication Barnes had with Plaintiff regarding his

bills.  In the July 7, 2003 letter, Barnes informed Plaintiff that the NAACP litigation fund

was depleted and that many of the experts in the Acusport litigation were "essentially

doing this work pro bono."  (Pl. Ex. 94).  A series of correspondence followed between

Barnes and Plaintiff regarding his bills.  Through this correspondence, Barnes relayed

objections to each of the three invoices submitted by Plaintiff, which remained unpaid.

10.     As a result, Plaintiff filed the instant litigation against the NAACP on November 4,

2003.

11.     On March 4, 2005, after this case was set for trial, Plaintiff received a check from

the Defendant in the amount of $138,536.51.  This amount was calculated as the

payment of $103,805.00, representing the total fees billed within Plaintiff's first and third

invoices; $32,047.51, representing a portion of the expenses included on the first

invoice and all of the expenses included on the second and third invoices; and an

additional payment of $2,684.00 for expenses incurred by Plaintiff but never before

billed to Defendant.  Defendant made this payment without any conditions.  Accordingly,

the only amounts left at issue were the total fees billed in the April 23, 2003 invoice and

a portion of the expenses billed in the January 8, 2003 invoice.

12.     Plaintiff withdrew his claim for the additional expenses before trial.  Therefore,

the Court must only determine whether Plaintiff is entitled to payment for the

$204,663.26 in fees reflected in the April 23, 2003 invoice.  Defendant claims Plaintiff

should only be awarded $74,295 of that amount, which represents the 226 hours

recorded through the date of his deposition; Plaintiff seeks full payment.  Both parties

agree Plaintiff is entitled to prejudgment interest.

### III.  Conclusions of Law

A.  **Breach of Contract**

The parties agree that Indiana law governs the nature, validity, and interpretation

of the contract.  It is further undisputed that Plaintiff and Defendant formed an express

oral contract under which Plaintiff would be paid $325 an hour plus his expenses to

serve as an expert in the Acusport litigation.  The issue in this case is whether all of the

work Plaintiff performed was within the scope of the contract.

Defendant argues that the time spent by Plaintiff was excessive and exceeded

the scope of the contract.  Defendant premises its position on the implied covenant of

good faith and fair dealing.  Plaintiff does not deny that this covenant exists; indeed,

Plaintiff spent much of the time at trial attempting to show that his actions were

reasonable given the scope of his assignment and the interaction he had with Barnes

and other attorneys representing the NAACP in the Acusport litigation.  As there is no

dispute about the hourly rate, the question is whether the number of hours Plaintiff billed

was appropriate under the oral contract.

The parties presented evidence regarding Plaintiff's work during the entire period

of his engagement, which is helpful to establish the scope of the undertaking and the

relationship between the parties.  However, the only issue to be decided is whether

payment is due under the April 23, 2003 invoice and therefore, the Court limits its

review to the time period reflected in that invoice (January 2, 2003 to March 31, 2003).

With respect to this time period, the Court generally accepts Plaintiff's testimony that the

tasks he performed were reasonably within the scope of his endeavor.  Defendant's

position that Plaintiff was "out of control" and performing unauthorized work is belied by

the email and other correspondence in the record.  For example, on February 18, 2003,

Barnes sent an email to Plaintiff thanking him for a "thoughtful and excellent job" during

his deposition.  (Pl. Ex. 26).  Barnes went on to say that she "wish[ed] everything in the

case were as effortless for [her]."  Id.  Additionally, Barnes sent an email to Plaintiff on

March 6, 2003 thanking him for the "wonderfully thorough and comprehensive

outline/critique of Bamberger's [one of the defendants' experts] report."  (Pl. Ex. 38).

Furthermore, Plaintiff sent numerous emails to Barnes or one of the other NAACP

attorneys working on the Acusport litigation discussing the work he was performing and

nowhere is there evidence of NAACP attorneys asking Plaintiff to curtail his work.[2]  (See

e.g. Pl. Ex. 27, 36, 54, 58, 59, 61).  The Court is especially persuaded by Barnes's July

7, 2003 letter to Plaintiff (Pl. Ex. 94) in which she expresses no dissatisfaction with

either the quality or quantity of Plaintiff's work, but simply tells Plaintiff that the NAACP

litigation fund is depleted and implies that Plaintiff should consider donating his services.

Ms. Barnes testified that she had never before suggested to Plaintiff that she expected

him to work pro bono or to reduce his fees.

---

[2]  Ms. Barnes testified that during one conference call, she told Plaintiff "this must stop;" however, Barnes appeared to be referring to Plaintiff's habit of sending slightly revised trial outlines to Barnes's staff.  Barnes also testified that she asked her staff to tell Plaintiff to stop sending the outlines.

When it became clear after Barnes's July 7, 2003 letter that Plaintiff was expecting full payment of his invoices, only then did Barnes begin to criticize the amount of time Plaintiff had spent.  Ms. Barnes also criticized Plaintiff during her trial testimony in this case.  However, this post-hoc criticism is not supported by evidence of dealings between Barnes and Plaintiff during the actual engagement.

Furthermore, by their own admission, neither Barnes nor anyone at the NAACP[3] objected to Plaintiff's invoices at the time they were rendered or at any time shortly thereafter.  Thus, whether or not Defendant thought the charges were excessive, Defendant gave Plaintiff no reason to believe his bills were unreasonable or to think he needed to limit his future work.

Having said this, the Court notes Plaintiff billed an average of 8.6 hours for every single day (including weekends) for the nearly two-month period between the date of his deposition and the date of the trial.  Plaintiff failed to fully document this substantial work, instead categorizing all of his time under the catch-all category "Preparation for trial."  The Court is unconvinced by Plaintiff's explanation that he could not provide more detail in the invoices because of work product privilege concerns.  Additionally, there was some acknowledged duplication.  For example, Plaintiff testified that he often had two individuals review the depositions (a research assistant and Plaintiff).  Some of his work also appeared to overlap with general academic pursuits.  Even assuming

---

[3] Ms. Barnes testified that she forwarded Plaintiff's January invoice to the NAACP sometime in February.

-8-

Plaintiff's good faith,[4] given this evidence, the large number of hours billed, including Plaintiff's billing for attendance at a gun industry conference in Florida (which was not approved by Barnes or the NAACP and was not necessary to the engagement), and the lack of ability to document his work, the Court is not convinced Plaintiff has shown by a preponderance of the evidence that the entire bill was reasonable.  Accordingly, the Court is required to determine how much of the bill is reasonable.

Given the block billing "Preparation for trial" catch-all Plaintiff used on the invoice, it would be impossible for the Court to conduct an hour-by-hour analysis in this case; the Court believes it is therefore appropriate to reduce the invoice amount by an appropriate percentage.  In the context of an attorney fee award, which the Court finds analogous to the instant situation, the Eleventh Circuit has held that in cases "[w]here fee documentation is voluminous, . . ., an hour-by-hour review is simply impractical and a waste of judicial resources."  Lorager v. Stierheim, 10 F.3d 776, 783 (11th Cir. 1994). Accordingly, in such cases, courts are permitted to utilize an "across-the-board percentage cut[]" to the number of hours claimed and provide a "concise but clear explanation of its reasons for the reduction."  Id.

The Court finds a reduction in the amount of thirty percent is appropriate because of the lack of documentation regarding Plaintiff's work and to offset redundancy and the other concerns expressed above.  Plaintiff is seeking payment for a total of 633.60 hours or $204,663.26.  With the thirty percent reduction, the Court finds Plaintiff is

---

[4] The evidence did not support Defendant's suggestion that Plaintiff did not actually perform some of the work for which he billed.

entitled to $143,264.28 for his breach of contract claim.[5]  While Defendant's total

payment to Plaintiff will still be substantial, the nature of the litigation and Defendant's

failure to better define or limit the scope of Plaintiff's activity justifies the result.

In its trial brief, Defendant admits Plaintiff is entitled to prejudgment interest.

Plaintiff seeks interest on each invoice from the date of the invoice to the date the

invoice was paid (for the January and July invoices) and to the date of the judgment (for

the April invoice).  There was no specific provision in either the oral fee agreement or on

the invoices as to when payment would be due.  The Court believes the interest on

each of these invoices should begin accruing as of thirty days after the conclusion of the

Acusport trial.  Based on the parties' conduct (including Plaintiff's failure to attempt to

collect on his invoices until the conclusion of the trial) and the custom and practice of

expert witness retention, it is reasonable to assume Plaintiff would not have expected

payment until after the trial.

**B.   Account Stated**

An account stated is "an agreement between the parties that all items of an

account and balance are correct, together with a promise, expressed or implied to pay

the balance." B.E.I., Inc. v. Newcomer Lumber & Supply Co., 745 N.E.2d 233, 236 (Ind.

Ct. App. 2001) (internal citation omitted).  This agreement acts as a new contract, and

the plaintiff is not required to plead and prove the creation and performance of the

separate contracts underlying the account.  Id.  The agreement that the balance is

---

[5]  Of course, this is in addition to the $138,536.51 Defendant has already paid
Plaintiff for his work in this case.

correct does not have to be explicit; it may be inferred from delivery of a statement and the debtor's failure to object to the amount stated within a reasonable period of time. Id. (citing, Auffenberg v. Board of Trustees of Columbus Regional Hosp., 646 N.E.2d 328, 331 (Ind. Ct. App. 1995)).

The Court is not persuaded by a preponderance of evidence that Defendant's lack of immediate response to Plaintiff's invoices is sufficient to prove an account stated claim. Because Defendant paid both the January and the July invoices, the April 23, 2003 invoice is the only one at issue. Through Ms. Barnes, Defendant first expressed concern about this invoice in July 2003. Given that the Acusport case was in trial during part of this time, such a delay is not unreasonable. Moreover, Plaintiff acknowledged as much at the time. (Pl. Ex. 98). As stated previously, the Court believes that given the parties' conduct and the custom and practice of expert witness retention, it was reasonable to conclude that Plaintiff would be paid at the conclusion of the trial. Accordingly, Plaintiff's account stated claim fails.

## IV.  Court's Decision

Based upon these findings of fact and conclusions of law, Plaintiff is entitled to $143,264.28 plus prejudgement interest (on all three invoices) on his breach of contract claim and nothing on his account stated claim. Plaintiff, after giving Defendant an opportunity to review it, is directed to submit a proposed judgment consistent with these findings no later than August 25, 2005.

**DONE AND ORDERED** at Jacksonville, Florida this 16th day of August, 2005.

TIMOTHY J. CORRIGAN
United States District Judge

Copies to:

Counsel of Record